**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

```
FILED
JAMES J. WALDRON, CLERK
December 16, 2010
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY: /s/Diana Reaves, Deputy
```

IN RE

Carlo and Judy Catenaccio

                Debtors.

CHAPTER 7

CASE NO.:   10-13928  (NLW)

**OPINION**

**Before:**     **HON. NOVALYN L. WINFIELD**

**A P P E A R A N C E S :**

Eric R. Perkins, Esq.
Jeffrey Bernstein, Esq.
Josua A. Zielinski, Esq.
McElroy, Deutsch, Mulvaney & Carpenter
40 West Ridgewood Ave
Ridgewood, NJ 07450
Attorneys for Trustee


Thomas D. McKeon, Esq.
570 Kearny Avenue
P.O. Box 452
Kearny, NJ 07032
Attorney for Debtors

This matter is before the court on the motion by Carlo and Judy Catenaccio ("Debtors") for a determination that certain funds held in savings accounts are not property of the bankruptcy estate. The Debtors request that this court issue an order to release the funds held in joint bank accounts by Carlo Catenaccio ("Carlo") and a non-debtor, John Catenaccio ("John"), because the funds in the savings accounts are John's property. As set forth at greater length below, the Debtors' motion is granted.

The court has jurisdiction to review and determine this matter under 28 U.S.C. §§ 1334(b) and 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This matter is a core proceeding under 28 U.S.C. §157(b)(2)(A), (E) and (O). The following constitutes the bankruptcy court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## FINDINGS OF FACT

### A. Background

On February 11, 2010, Carlo and Judy Catenaccio ("Debtors") filed for relief under Chapter 7 of title 11 of the United States Code ("Bankruptcy Code"). Shortly thereafter, Eric R. Perkins ("Trustee") was appointed as the Chapter 7 trustee to investigate, liquidate and administer the Debtors' estate. On February 25, 2010, Kearny Federal Savings Bank ("Bank") advised the Debtors' counsel and the Trustee that its review of the Debtors' bankruptcy petition revealed that Carlo did not disclose the existence of three savings accounts, containing funds in excess of $275,000.00, on which he is a co-owner (hereinafter "Joint Accounts"). (Trustee's Ex. 2) In fact, Carlo did not list any interest of the Joint Accounts on the schedule of assets to his bankruptcy petition. (Dkt. #1;

Chapter 7 Trustee's Certification in Opposition to Debtor's Motion for an Order to Release Funds ("Trustee's Cert.") ¶ 7)  Since the Trustee's receipt of the Bank's letter, it was established that:

(i) On August 21, 2000, John added Carlo's name to account xxx659. (Trustee's Cert. ¶ 3)

(ii) On March 1, 2008, John added Carlo to the second account xxx493. (*Id.* ¶ 4)

(iii) On May 19, 2009, John and Carlo opened a new joint account xxxx525. (*Id.* ¶ 5)

After receiving the letter from the Bank regarding the Joint Accounts, the Trustee immediately demanded that the Bank turn over all of the funds held in Carlo's name. (*Id.* ¶ 9)  On the same day, the Debtors objected to the turnover of any funds in the aforementioned Joint Accounts, claiming that those funds were John's property. (*Id.* ¶ 10)  Given the conflicting claims to the Joint Accounts, the Bank informed the Trustee that it would not turn over the funds without a court order pursuant to 11 U.S.C. § 543. (*Id.* ¶ 11)

The Debtors thereafter filed a motion for release of funds in the Joint Accounts. (Trustee's Cert. ¶ 13)  The Trustee, in turn, cross-moved for turnover of the funds. (*Id.* ¶ 14)  Subsequently, this court referred the matter to mediation. (*Id.* ¶15)  The parties failed to reach a settlement during the mediation and, on July 18, 2010, the Debtors renewed their motion for release of funds. (*Id.* ¶ 16)  Prior to the hearing the parties were able to agree that one half of the value of the Joint Accounts could be released to John, and the court entered a consent order to that effect on August 26, 2010 .  The Trustee and the Debtors agreed that the remainder of the funds should continue to be subject to an administrative freeze until the resolution of Carlo's interest in the Joint Accounts.

On September 28, 2010, this court conducted an evidentiary hearing in which various documents were received in evidence and John and Carlo testified as to the ownership of the funds in the Joint Accounts.  At the conclusion of the hearing, the court reserved its ruling.

### B. <u>Evidence Received at the Hearing.</u>

At the evidentiary hearing, this court carefully observed the demeanor of both John and Carlo while listening to their testimony. The court finds the testimony of both witnesses credible. The court further admitted the following Debtors' exhibits into evidence:

- Bank Account History from 2004 to 2010 (Ex. D-1)
- Bank Passbook for Account xxxx525 (Ex. D-2)
- Bank Passbook for Account xxx659 (Ex. D-4)
- Bank Passbook for Account xxx493 (Ex. D-6)
- HUD-1 Uniform Settlement Agreement from the Sale of 426 River Road, North Arlington, NJ (Ex. D-8)

The parties also stipulated as to admission of the thirty-two exhibits by the Trustee, some of which are duplicative of the Debtors' exhibits.

### 1. John's Testimony

At the hearing, John testified that he immigrated to the United States from Italy in 1954. (Hr'g Tr. 6:6-7, Sept. 28, 2010)  John has now been retired for eighteen years. (*Id.* 5:25-6:1)  Prior to retirement, he worked in the construction business as a laborer. (*Id.* 6:2-6, 18:3)  He received a fifth grade education in Italy and can read English "a little bit." (*Id.* 7:12-14, 19:22-23, 33:19)  Until his wife's death in 2000, she took care of the financial affairs in the family. (*Id.* 20:17-18)  John and his wife maintained accounts with the Bank for over fifty years. (*Id.* 7:11)  After his wife's death, on August 21, 2000, John removed her name from account xxx659 and added Carlo. (John Catenaccio Dep. 11-12, Apr. 28, 2010; Trustee's Cert. ¶ 3)  Sometime in 2008, John suffered a stroke. (Hr'g Tr. 20:25-21:1)  He was in the hospital for thirty one days and underwent five months of therapy. (*Id.*

21:2-5) While in the hospital, Carlo paid bills on John's behalf. (*Id.* 22:3-13) Carlo, however, never withdrew money from the Joint Accounts. Instead John testified that he gave Carlo "[t]he check money. The social security and pension." (*Id.* 22:10-11)

John has been the sole depositor of monies into the Joint Accounts. (*Id.* 11:25 – 12:3, 16:2-6) Specifically, prior to May of 2009, the deposits into the Bank accounts came "[f]rom the pension and the social security" as well as the money John saved when he was working. (*Id.* 12:5-6) On May 11, 2009, John sold his house at 426 River Road, North Arlington, NJ and received net proceeds of $164,019.00. (Hr'g Tr. 14:15-20; Ex. D-8; Trustee's Ex. 4) From these proceeds, on May 19, 2009, John deposited $114,019.00 into account xxx659. (Hr'g Tr. 15:1-4; Ex. D-1; Trustee's Ex. 7) On the same day, he also deposited $50,000.00 into a newly opened savings account xxxx525. (Hr'g Tr. 8:22, 15:5-9; Ex. D-1; Trustee's Ex. 7) The account xxxx525 was opened in the names of John and Carlo Catenaccio as joint tenants with right of survivorship. (Hr'g Tr. 29:4-13; Trustee's Ex. 6)

John testified that he did not intend to give $50,000.00 to Carlo, but that the money was put away for his five children and heirs of one child who passed away. (Hr'g Tr. 8:24-25 - 9:1-10, 23:17-19) John further testified that he added Carlo's name to the two other accounts so that "in case anything happening to me, he would have took over." (*Id.* 32:2-6) John also maintained possession of the passbooks for the Joint Accounts in order to preclude anyone from withdrawing the funds: "Nobody could take the money out because I had the books." (*Id.* 31:17) John insisted that "Carlo not own anything." (*Id.* 32:4)

Following John's stroke and until recently, John lived with Carlo. John testified that when he lived with Carlo, he helped Carlo with mortgage payments and paid his car off. (*Id.* 34:14-16) John further stated that "I not only helped him with that, I paid rent too and I paid to wash the clothes

5

and electric too. I understand they had none and I helped him out." (*Id.* 34:16-18) When questioned about why he withdrew $15,000.00 out to pay off Carlo's van and whether if Carlo needed money he would give it to him, John testified: "Yeah, I'm his father. If I can – if a father can't help his son I understand that, this country is gone then." (Hr'g Tr. 35:5-8) When specifically asked whether he intended that Carlo become an owner of the Joint Accounts, John insisted: "No. No own. Just in case anything happening to me, he – he'd be in charge." (*Id.* 35:22-23) He further stated "the bank never notify me that you got to do it this way. If they would have told me I would have did it. I would have did it the way they told me to do. They should have told me I got to do different way. Not just to put Carlo's name like that." (*Id.* 36:8-12) When questioned whether he read the documents that were presented to him by the Bank when Carlo's name was added, John said: "Yeah but I don't understand it too much. They should have explained it to me. I know – I wasn't born in this country." (*Id.* 36:15-16)

### 2. Carlo's Testimony

At the hearing, Carlo testified that he filed for bankruptcy because he "was overwhelmed with bills" as the result of being unemployed for a while and undergoing two hip replacement surgeries, one in 2007 and one in 2009. (*Id.* 41:4-9) Carlo states that he received only a tenth grade education and is currently working as operations manager at Atlantic Aviation in Teterboro. (*Id.* 41:12-17)

When questioned about the Joint Accounts, Carlo testified that he never withdrew money from these accounts. (Hr'g Tr. 41:20-25 – 42:2) He did, however, admit to have cashed his paychecks against those accounts. (*Id.* 42:6-8) When questioned as to why Carlo cashed his paychecks against the Joint Accounts, he stated: "I was paying, I forget how many percent, to a check cashing place and I – the – I could just cash my check there without paying a certain percentage on

it." (*Id.* 42:6-9) Carlo also testified that he did not have any accounts with the Bank and that his own accounts at Sovereign Bank might have had a hundred dollars. (*Id.* 42:21-25 – 43:7)

Carlo further confirmed that John paid Carlo's car off because "I was getting a lot of phone calls on it and he questioned me why I was getting so many phone calls and I eventually had to tell him [of the financial troubles]." (*Id.* 43:11-13) Carlo also testified that John never asked him to repay the money and that John would give "us some money every month for the bills." (*Id.* 43:16-21) Carlo further stated that he did not list the Joint Accounts on his bankruptcy petition "[b]ecause it wasn't my money." (Hr'g Tr. 44:8-10) Carlo also stated that John told him that he was putting $50,000.00 from the sale of his house in a "separate account for all the kids." (*Id.* 44:22-25) As to why he was named as a joint account holder, he testified:

> He [John] said to me one day, he says, we have to go up to the bank and we have to put your names on the accounts just in case something happens to me. I didn't question it. I have no idea, you know, about banking. I'm illiterate when it comes to banking and I says, okay, let's go. So, we went up, did what we had to do. I didn't read anything. I just signed and here we are today.

(*Id.* 45:5-11)

When asked about why Carlo did not use direct deposit for his paychecks and instead cashed his checks against the Joint Accounts, he stated the following: "I'm illiterate to banking. I was raised from my father. I guess he – he has six grade education, I have a tenth education and I'm not up to speed with banking. I don't trust direct deposit. I'm old school. I get paid. I go cash my check and I pay my bills." (*Id.* 45:18-22)

At closing of his testimony, Carlo insisted: "It was my father's money. He had the books. I didn't give it a second thought. That's why I never told you that my name was on the accounts. … If it was my money, I wouldn't have no mortgages, trust me." (*Id.* 46:9-14)

Notably, the Joint Accounts' history supports both Carlo's and John's testimony that the

7

funds in the accounts are solely John's property. There is no account history demonstrating deposits or withdrawals by Carlo. Specifically, account xxxx525 contains John's initial $50,000.00 deposit and accrued interest. (Trustee's Ex. 9; Ex. D-1) The account history for xxx659 reflects the $114,019.00 deposit along with John's monthly pension and social security deposits. (Trustee's Ex. 14; Ex. D-1) Account xxx493 contains the original balance when Carlo's name was added to this account on March 1, 2008 and accrued interest. (Ex. D-1)

## II. CONCLUSIONS OF LAW

### A. Property of the Bankruptcy Estate Under 11 U.S.C. § 541(a)(1)

In a Chapter 7 case, it is the trustee's duty to "collect and reduce to money the property of the estate for which trustee serves." *In re Jasmin*, 258 B.R. 119, 123 (D.N.J. 2000) (citing 11 U.S.C. § 704(a)(1)). Furthermore, "[t]he trustee has a fiduciary relationship with all creditors of the estate and it is the trustee's duty to 'maximize the value of the estate' for these creditors." *Id.* (citing *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996)). Because of his duty to the Debtor's creditors the Trustee was obligated to investigate the non-disclosure of the Joint Accounts and seek turnover of the accounts if he determined it was appropriate.

Pursuant to 11 U.S.C. § 541(a)(1), the bankruptcy estate is comprised of, "all legal and equitable interests of the debtor in property as of the commencement of the estate. *United States v. Pelullo*, 178 F.3d 196, 203 (3d Cir. 1999) (citing 11 U.S.C. § 541(a)(1)). Importantly, § 541 is extremely broad and includes all types of interests that the debtor owns upon filing a petition except for those specifically excluded elsewhere in § 541. *In re O'Dowd*, 233 F.3d 197, 202 (3d Cir. 2000); *Morris v. Phila. Elec. Co.*, 45 B.R. 350, 351 (E.D. Pa. 1984); *see also* H.R. Rep. No. 95-595, at 367 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323. However, "[w]hile federal law defines what

types of property comprise the estate, state law generally determines what interest, if any, a debtor has in property."[1] *O'Dowd*, 233 F.3d at 202 (citations omitted).

Thus, in order to determine whether Carlo held any interest in the Joint Accounts, this court must examine and apply the relevant New Jersey law.

### B. New Jersey Multiple-Party Deposit Account Act

The New Jersey Multiple-Party Deposit Account Act ("Act"), in relevant part, provides:

> Unless a contrary intent is manifested by the terms of the contract, or the deposit agreement, or there is other clear and convincing evidence of a different intent at the time the account is created:
>
> (a) joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit. In the absence of proof of net contributions, the account belongs in equal shares to all parties having present right of withdrawal.

N.J. Stat. § 17:16I-4(a) (2010).

As set forth above, the testimony establishes that only John, not Carlo, contributed funds to the Joint Accounts. The Trustee did not produce any testimony or exhibits to the contrary. Accordingly,

---

[1] The Supreme Court has stated that:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner v. U.S.*, 440 U.S. 48, 55 (U.S. 1979) (citing *Lewis v. Manufacturers Nat'l Bank*, 364 U.S. 603, 609(U.S. 1961)

under the terms of the Act, the joint account funds belong to John unless "there is other clear and convincing evidence of a different intent." *Id.*

For example, the presumption of ownership established by the statute can be overcome if it is established that the original depositor made an irrevocable *inter vivos* gift to the other party on the account. *See Lebitz-Freeman v. Lebitz*, 353 N.J. Super. 432, 438 (N.J. Super. Ct. App. Div. 2002), *cert. granted,* 175 N.J. 78 (2002) *appeal dismissed,* 179 N.J. 262 (2003). But, "the creation of a joint bank account, with right of survivorship,… does not, by itself, constitute an *inter vivos* gift by the party depositing assets into the account to the other named party." *Lebitz-Freeman,* 353 N.J. Super. at 436 (citing *Sadofski v. Williams*, 60 N.J. 385, 397-99 (N.J. 1972)); *see also Bauer v. Crummy*, 56 N.J. 400, 410-11 (N.J. 1970)). It is recognized, for instance, that such accounts are often used as a means of testamentary disposition, referred to as a "poor man's will." *Id.* (citing *Sadofski*, 60 N.J. at 395). Further, "[i]f a joint account, with right of survivorship, is established for …[testamentary] purpose, the assets in the account remain the sole property of the depositor during his or her lifetime."*Id.* (citing *Bauer*, 56 N.J. at 410). "[T]he determination of ownership of the assets in a joint account turns on whether the depositor's intent in creating an account was to make an *inter vivos* gift or solely to establish a vehicle for testamentary disposition." *Id.* (citation omitted).

Under New Jersey case authority, the elements of *inter vivos* gift are "(1) an unequivocal donative intent on the part of the donor; (2) an actual or symbolical delivery of the subject matter of the gift; and (3) an absolute and irrevocable relinquishment by the donor of ownership and dominion over the subject matter of the gift." *In re Dodge*, 50 N.J. 192, 216 (N.J. 1967). The proof of each of the elements must be "clear, cogent, and persuasive." *Lebitz-Freeman*, 353 N.J Super. at 437 (citing *Czoch v. Freeman*, 317 N.J. Super. 273, 284 (N.J. Super. Ct. App. Div. 1999) (quoting *Farris v. Farris Eng'g Corp.*, 7 N.J. 487, 501 (N.J. 1951), *certif. denied*, 161 N.J. 149 (N.J. 1999))). Clear

and convincing evidence, "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In re Purrazzella*, 134 N.J. 228, 240 (N.J. 1993) (quoting *Aiello v. Knoll Golf Club*, 64 N.J. Super. 156, 162 (N.J. Super. Ct. App. Div. 1960)). The evidence must be "so clear, direct and weighty and convincing as to enable [the factfinder] to come to clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Seaman*, 133 N.J. 67, 74 (N.J. 1993) (citing *In re Boardwalk Regency Casino License Application*, 180 N.J. Super. 324, 339 (N.J. App. Super. Ct. Div. 1981), *modified*, 90 N.J. 361 (1982) (quoting *Aiello*, 64 N.J. Super. at 162)).

In the matter at hand, the Trustee did not produce clear and convincing evidence that John made an *inter vivos* gift of funds in the Joint Accounts to Carlo. First, there is no evidence that John expressed an unequivocal donative intent to Carlo with regard to the Joint Accounts. On the other hand, the testimony of both John and Carlo evidence John's intent to create a testamentary disposition. The account changes were effected after John's wife died, after John's stroke, and after John sold his home. These are all major life events, and it is readily understandable that John made Carlo a joint account holder "in case anything happening to [him]." Also consistent with a intent to only create a testamentary disposition is the fact that there is no evidence that Carlo ever deposited funds into, or withdrew funds from, the Joint Accounts.[2] Furthermore, even if adding Carlo to the Joint Accounts could be considered to be an actual delivery of a gift, it is rebutted by the fact that John has never relinquished control of the Joint Accounts. Instead, he has maintained control of the

---

[2] The Trustee points out that Carlo cashed his paychecks against the Joint Accounts. The fact that Carlo cashed his paychecks against the Joint Accounts does not evidence that Carlo deposited or withdrew funds from the Joint Accounts. Carlo's testimony establishes that his personal account at the Bank did not contain adequate funds against which he could cash his paycheck. Carlo simply used the Joint Accounts to ensure that he could immediately cash his paycheck.

passbooks. John's voluntary gifts to Carlo also evidence that he alone has exercised control over his funds, including the Joint Accounts. As established by the testimony, John gave money to Carlo in specific amounts and for specific purposes. Such conduct is inconsistent with the Trustee's contention that John made an *inter vivos* gift to Carlo of Joint Accounts containing funds in excess of $275,000.00. In essence, by adding Carlo as the joint account holder, John created a classic "poor man's will" that did not vest any property interests in Carlo during John's life.

The Trustee urged the court to find that a joint bank account creates a rebuttable presumption of a donative purpose to take effect *in praesenti. See Link v. Link*, 3 N.J. Super. 295, 297 (N.J. Supp. Ch. 1949); *see also In re Dodge*, 90 N.J. Super 198, 208 (N.J. Supp. 1966), *rev'd,* 50 N.J. 192 (N.J. 1967). As the Debtors point out, however, these cases were decided prior to the enactment of the Act in 1980. The purpose of the Act was to address the controversies relating to the ownership of joint accounts, such as in the matter at hand. Specifically, the Assembly Judiciary, Law, Public Safety and Defense Committee's Statement is especially illustrative of the intent of the drafters of the Act:

> The pertinent language of the bill will fill the gap in the existing law and control *inter vivos* rights of parties to a joint account in the absence of a contrary intent expressed in the deposit agreement or clear and convincing evidence of a different intent at the time the account is created. It eliminates possible first come-first serve, race-to-the-bank situations, and guarantees, for example, upon dissolution of the account during the lifetime of all parties, that each party will get a share proportionate to his net contributions to the account.

N.J. Stat. Ann. §17:16I-1.

Therefore, the court cannot find that a joint account creates a rebuttable presumption of donative intent. *Arguendo*, even if the court were to find to the contrary, evidence presented in this matter points to lack of *inter vivos* donative intent in the Joint Accounts on John's part.

12

## **CONCLUSION**

The Trustee did not demonstrate by clear and convincing evidence that John intended to make an *inter vivos* gift to Carlo.   Since Carlo does not possess any interest in the Joint Accounts under New Jersey law, the Trustee cannot claim such accounts as property of the estate under §541(a)(1).


Dated: December 16, 2010                              /s/
                                                      NOVALYN L. WINFIELD
                                                      United States Bankruptcy Judge